# United States District Court
# Northern District of Indiana
# Hammond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 2:08-CR-44 JVB |
| | ) | |
| JOHN VINSON | ) | |

**OPINION AND ORDER**

On April 15, 2008, the Grand Jury indicted Defendant John Vinson for possessing with intent to distribute, more than five grams of cocaine base on March 7, 2008, in violation of 21 U.S.C. § 841(a)(1). On August 20, 2008, the government filed a superceding indictment, adding a second count of being a felon in possession of a handgun. The second count arose out of a January 30, 2008, search of a home that the Defendant is alleged to have lived in.[1]

On September 29, 2008, the Defendant filed three motions: a Motion to Suppress Gun Evidence to be Used in Count 1; a Motion to Dismiss the Indictment; and a Motion to Suppress Drug Evidence to be Used in Count 2.

On December 5, 2008, the Court held an evidentiary hearing on the Defendant's Motion to Suppress Drug Evidence to be Used in Count 2.[2] Since then, the government and the Defendant have asked for several briefing extensions (DE 29, 49, 51, and 53), which the Court has granted. The briefing was completed on March 2, and the Court now issues its ruling on the Defendant's motion to suppress the drug evidence to be used in Count 2. The Court will also rule

---

[1]On October 24, 2008, the Court severed the two Counts, and currently two separate trials are scheduled.

[2]The Court did not hold an evidentiary hearing on the other two motions, finding that they can be decided on the parties' briefs alone.

on the Defendant's two other motions.

**A.      Defendant's Motion to Dismiss Gun Evidence to be Used in Count 1 of the Superceding Indictment**

**(1)      *Search Warrant Affidavit***

On January 25, 2008, Sgt. Robert Repay submitted to Hammond City Court a search warrant affidavit. In it he stated that a residence at 430 176th Court, Hammond, was being used to store and use cocaine. In the affidavit, Repay set out the following facts:

On May 23, 2007, Confidential Source (CS) made a controlled cocaine purchase from Tim at 2627 162nd Place. When CS arrived to Tim's place, Tim did not have the crack cocaine and he had to call someone called J to bring the cocaine to Tim. J came an hour later, and after he left, Tim sold CS some crack cocaine. J was a black male and drove a purple Dodge Intrepid with license plate GV 4782.

On May 29, 2007, Repay and another officer were in the area of 7300 Harrison, when they saw the same purple Dodge Intrepid being driven by J. Repay followed J and saw him park the car in the driveway of 430 176th Court. J stood outside his car and watched the officers pass by. He then followed the officers and tried to identify them.

On June 5, 2007, Repay showed CS four photos from which CS identified J. The photo CS identified as J was the photo of the Defendant. A criminal history check showed that in 1999 the Defendant had been convicted of possessing cocaine and sentenced to six years of imprisonment.

On October 3, 2007, Repay and another officer removed trash from the city issued garbage can at 430 176th Court. The officers found two baggies with cocaine residue inside them

and an Enterprise Car Rental agreement signed by Defendant. They also found a piece of mail addressed to 430 176th Court.

On January 24, 2008, Repay and another police officer once more searched the garbage at 430 176th Court. They found numerous plastic baggies with cocaine residue on them, many other plastic baggies, and two pieces of mail addressed to 430 176th Court. While the officers were removing the trash, the purple Dodge Intrepid was parked in the driveway.

The next day, on the basis of this information, Repay asked a Hammond City Judge to issue a warrant to search 430 176th Court for narcotics, US currency, paraphernalia, weapons, and any documentation related to drug dealing activity. The Judge issued the warrant and five days later police officers searched the residence, where they found various items of contraband and the weapon which forms the basis for Count 1 of the Superceding Indictment.

**(2)** *Discussion*

(a) *Summary of Arguments*

The Defendant argues that the search warrant affidavit was facially invalid because it failed to establish that the Defendant lived at 430 176th Court. The Defendant believes that Repay purposely omitted vital information that would have shown that the residence had no relation to the Defendant. In addition, the Defendant suggests that the evidence related in the search warrant affidavit was stale. Therefore, the Defendant asks the Court to suppress the gun recovered during the search. In the alternative, the Defendant requests a *Franks* hearing to determine if Repay purposely omitted material facts.

The government responds that a *Franks* hearing is not warranted because the Defendant

has not made a substantial preliminary showing that Repay lied in the search warrant affidavit. The government also asserts that Repay's affidavit does include facts from which a judge could find probable cause that illegal activity would be uncovered at 430 176th Court. In the alternative, the government argues that because the officers who executed the search warrant were acting in good faith the exclusionary rule does not apply.

The Court finds no basis for granting any aspect of the Defendant's motion.

(b)     *Franks Hearing*

The Court's review of a challenge to the validity of a search warrant is limited to the information contained in the search warrant affidavit. *See Hackney, Inc. v. McLaughlin*, 895 F.2d 1298, 1300 (10th Cir. 1990) ("The 'four corners doctrine' limits challenges to the validity of search warrants to review of the materials submitted to the magistrate."). Nevertheless, when the veracity of the affidavit is challenged, a defendant may be entitled to an evidentiary hearing if he meets certain requirements outlined in *Franks v. Delaware*, 438 U.S. 154 (1978):

> To mandate an evidentiary hearing . . . [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id*. at 171–72. The search warrant affidavits are presumed to be valid. *See id*. at 171.

Here, the Defendant has not met his burden in showing that he is entitled to a *Franks* hearing: he neither provided any sworn or otherwise reliable statements of witnesses that Repay lied or recklessly disregarded the truth, nor has he satisfactorily explained their absence. As the

Defendant's brief shows, he is familiar with the requirements for invoking a *Franks* hearing, and his failure to even attempt to meet these requirements is an indication that he has nothing to present. Therefore, the Court will deny the Defendant's request for a *Franks* hearing.

(c)     *Search Warrant Affidavit*

Having decided that the Defendant is not entitled to a *Franks* hearing, the Court will consider the affidavit as it was presented to the Hammond City Court Judge. Under the Fourth Amendment, a warrant is valid only if it is based "upon probable cause, supported by Oath or affirmation, and particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A defendant, therefore, may challenge a warrant for lack of probable cause. However, given the great deference that is afforded a judge's determination of probable cause, the challenge is limited:

> [a] magistrate's determination of probable cause is to be given considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated. . . . [D]oubtful cases should be resolved in favor of upholding the warrant.

*United States v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000) (citations omitted). Probable cause is a probability of or a substantial chance of criminal activity, not an actual showing of criminal activity. *Illinois v. Gates*, 462 U.S. 213, 244 (1983).

Repay's affidavit established probable cause so as to justify the issuance of a search warrant for the residence at 430 176th Court. Repay stated that in May 2007, J, who was later identified as the Defendant, supplied Tim with crack cocaine to be sold to CS. The Defendant

5

drove to Tim's residence in a purple Dodge Intrepid with license plate GV 4782. Repay saw the Defendant again a week later in the same car and followed him until he pulled into the driveway of 430 176th Court. In October 2007, Repay looked through the trash at this residence and found evidence of narcotics distribution as well as a rental car contract for the Defendant, with the Defendant's signature on it. Defendant's delivery of crack cocaine to Tim, the baggies with cocaine traces on them and rental car documents signed by the Defendant all corroborated Repay's belief that illegal drugs and related items could be found at 430 176th Court. Furthermore, during another trash pull on January 24, 2008, Repay again found baggies with cocaine traces. Moreover, while Repay was collecting the trash, the purple Dodge Intrepid was in the driveway of the home. Again, such evidence further corroborated the evidence of possible illegal activity at the residence. Therefore, viewed as a whole in a realistic and common sense manner, the search warrant affidavit alleges facts and circumstances from which the judge could reasonably conclude that the items sought to be seized were associated with the crime and located in the place indicated, especially since Repay applied for the search warrant the very next day after the trash pull. This latter factor does away with the Defendant's argument that the information in the search warrant affidavit was stale because Repay collected the information intermittently over a period of eight months.

Since the Court finds that the search warrant affidavit established probable cause that illegal activity was taking place at 430 176th Court, the Court need not address the issue of whether the officers who executed the search warrant relied on the search warrant in good faith. Instead, for the reasons stated above, the Court will deny the Defendant's Motion to Suppress Gun Evidence to be Used in Count 1 of the Superceding Indictment.

## B. Defendant's Motion to Dismiss the Indictment

In his motion to dismiss the Indictment, the Defendant claims that the drug possession charge (Count 2) should be dismissed because of prosecutorial misconduct and constitutional violations during the Grand Jury proceedings. In the alternative, the Defendant requests disclosure of all grand jury materials relating to the Indictment and Superceding Indictment in this case. The Defendant argues that, in dismissing the Indictment, the Court would properly exercise its supervisory powers and would remedy injustice brought upon the Defendant.

In particular, the Defendant states in his brief:

> Defendant was indicted initially on one-count of possessing with intent to distribute. His superceding indictment continued to include this count. But the arresting officer, and presumably the person who testified before the grand jury, stated under oath during the detention hearing that [he] has not formed an opinion as to whether Vinson was the buyer or the seller on March 7, 2008—the date of the incident on which Count 2 in the superceding indictment is based on. As a result, it appears that Campos may have lied during the grand jury proceedings.

(Def. Br. at 3, DE 21.)

He continues:

> Here, absent a showing that other evidence besides Campos' testimony was provided to the Grand Jury to show intent to distribute, the Court should find that the Grand Jury received bad evidence, and that their indictment was based on that bad evidence—whether the testimony was intentionally misleading or incredibly negligent. The impact was clearly prejudicial. The introduction of wrong information that was crucial to the indictment was fundamentally unfair, and therefore the indictment must be dismissed.

(*Id*. at 7.)

The Defendant also claims that the government deliberately misled the Grand Jury or created false impressions in an effort to obtain an indictment and that it knowingly used perjured

7

testimony. (*Id*. at 8.)

Finally, the Defendant submits that Count 1 of the Superceding Indictment (the gun count) should be dismissed because "there is no way of knowing what the Grand Jury would have done with the gun count if they were informed of the misrepresentation [on count 2]."(*Id*. at 9.)

The government responds that the Defendant's allegation that one of its witnesses lied to the Grand Jury is speculation without any basis in fact. The government believes that the Defendant has filed the motion only to obtain the Grand Jury testimony, in violation of the Jenck's Act. Moreover, the government argues that the Court has no supervisory power over the grand jury and disagrees with the Defendant that his Constitutional rights were violated.

The Defendant is asking this Court for too much and on the basis of mere conjecture. As a general rule, the district court has no supervisory authority over the grand jury. *United States v. Stout*, 965 F2d 340, 343 (7th Cir. 1992). The exercise of its supervisory authority is limited to those instances that violate the integrity of the Grand Jury functions, such as violations of the Constitution, applicable statutes, or the Federal Rules of Criminal Procedure. *United States v. Gillepsie*, 974 F.2d 796, 801 (7th Cir. 1992). Judicial review of Grand Jury proceedings is limited because the Grand Jury is traditionally an independent body; its proceedings are protected by secrecy. Courts should not interfere with the Grand Jury's law enforcement function: the doctrine of separation of powers limits the courts' ability to supervise the conduct of prosecutors, who are members of the Executive Branch. Grand Jury proceedings are presumed valid. *See Costello v. United States*, 351 U.S. 359, 363 (1956); *United States v. Calandra*, 414 U.S. 338, 350 (1974). This Court will not interfere with the Grand Jury's decision to indict the

Defendant because more than a speculation is needed to overcome this presumption of validity.

Nor will the Court grant the Defendant's request to disclose to him all Grand Jury materials, as that is a veiled request for the Jenck's Act materials, which are not due until a witness testifies at trial:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness . . . shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.[3]

18 U.S.C. § 3500(a).

**C.     Defendant's Motion to Suppress Drug Evidence to be Used at Trial in Relation to Count 2 of the Superceding Indictment**

**(1)    *Facts Related to Count 2***

Having reviewed the evidence presented at the evidentiary hearing, and having evaluated the credibility of the witnesses, the Court finds the following materials facts related to Count 2:

Hammond Police Officers Brian Campos and Michael Noworyta were on patrol on March 7, 2008. Around 8:45 p.m., Campos and Noworyta were driving in a marked squad car north on Hohman Avenue. Campos was the driver, and Noworyta was in the passenger's seat. The car was moving at about ten miles per hour and there were no other cars on the street. As they were approaching an apartment complex parking lot near 141st Street and Hohman, Campos saw a parked Ford Taurus, facing westbound, with its lights on. A white man with dark rimmed glasses walked up to the passenger's side of the Taurus and handed something to the

---

[3] The general practice in this district by the United States Attorney's Office is to disclose the Jenck's Act materials on a Friday before trial.

driver. The driver, who turned out be the Defendant, was the only person in the car. Nothing obstructed Campos's view as he observed this transaction through the rear window of the Taurus. After the transaction, the white man turned and looked directly at the squad car with a panicked expression on his face. He then hurried into Apartment 8 on the corner; he did not run but walked quickly and shut the door. On the basis of his training and experience, which consisted of several hundred narcotics related arrests and observations of a couple dozen hand-to-hand narcotics sales, Campos believed that he had just witnessed a drug deal. Also, Campos knew that they were in an area where gang activity was common.

Campos told Noworyta that he thought he had seen a drug deal taking place. Noworyta did not see the exchange, but when he looked toward the car, he recognized the white man as William Asbell, whom he had previously arrested on a warrant for marijuana possession. Moreover, Noworyta knew that Asbell lived in Apartment 8.

Campos decided to investigate and pulled into the parking lot where the Taurus was parked. He parked the squad car diagonally about ten to fifteen feet in front of the Defendant's car and, to be safe, shined his spotlight into the passenger's compartment of the Defendant's car. Campos did not activate the lights or the sirens of the police car. Because of the position of the squad car, the Defendant could not drive forward, but he could have backed out of the parking lot onto Hohman Avenue.

As soon as Campos stopped the car, the officers got out. Since both of them were focused on the Taurus and its passenger, it is unclear who got out first. Campos approached the Taurus from the passenger's side. The passenger window was rolled down and when Campos was about five feet away from the car, he saw the Defendant looking at him and Noworyta in "a frantic

state, kind of packing [sic] back and forth at both of us. And it looked like he was, like freaking out . . . he started reaching in his pocket, and he pulled out a plastic bag, and he stared to reach down towards his left boot area, like pant leg—lower pant leg . . . he was trying to hide something." (Tr. at 13, 1–10.) Likewise, as Noworyta approached the Taurus, he saw the Defendant "looking left and right and was making this motion (indicating) toward his left—the left, lower part of his body, as if he was reaching for something." (Tr. at 56, 7–11.) Noworyta thought that the Defendant had a gun. (Tr. at 56, 15.)

Fearing for his safety, Noworyta ordered Vinson to get out of the car but the Defendant did not comply. Noworyta ordered him several times to show his hands but to no avail. By this time, Campos had drawn his gun and was also ordering the Defendant to show his hands. Noworyta opened the driver's door and forcibly removed the Defendant. He ordered the Defendant to place his hands on the car, but the Defendant again did not comply until ordered once more. Noworyta patted him down from the feet up because he was concerned that the Defendant was hiding something on the lower parts of his body. As Noworyta pulled up the Defendant's pants, a large plastic bag containing several smaller plastic bags filled with what appeared to be narcotics fell out of the Defendant's boot. The Defendant then tried to escape but tripped, allowing Noworyta to force him to the ground until Campos could assist in arresting him. Only several minutes passed from the moment Campos saw what he thought was the drug deal until the Defendant was arrested.[4]

---

[4] In his motion to suppress, the Defendant argues that the officers' stories are so inconsistent with each other that they should not be believed about anything. The Defendant submits that the only person worthy of credence is his girlfriend, to whom the Taurus belonged, and who testified that at the time of this incident, her car windows were tinted. The Court finds no basis to believe that Campos and Noworyta concocted the story. Their inconsistencies are minor (e.g., who got out of the car first, whether the driver's door of the Taurus was locked when Noworyta tried to open it, and whether the pat down was done from the top down or bottom up) and they do not call into doubt the core

**(2)** *Discussion*

The government argues that the initial encounter between the Defendant and the police officers was a voluntary encounter that quickly turned into a *Terry* stop, then eventually giving way to probable cause to arrest the Defendant for possession of crack cocaine. In the alternative, the government maintains that, from the beginning, the officers had reasonable suspicion to conduct an investigatory stop.

The Defendant, on the other hand, insists that from the very beginning the stop was an unjustified seizure, and that all the fruits of that seizure must be suppressed.

There are three types of police encounters with citizens. The first kind of encounter is an arrest requiring the police to have probable cause. The second type of encounter is a brief investigatory stop requiring the police to have specific and articulable facts giving rise to reasonable suspicion that criminal activity is afoot. The third kind of encounter is initiated by non-coercive police questioning, needing no suspicion at all.

Although the government insists that the initial encounter between Campos and Noworyta and the Defendant was not a seizure at all, the Court does not have to decide that issue as the officers were justified from the beginning to momentarily stop the Defendant for questioning. Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002). To determine whether reasonable suspicion exists, the courts examine the "totality of the circumstances" of each case to see whether the officer had a particularized and objective

---

of the story giving rise to the Defendant's arrest. Likewise, the minor differences in the officers' testimony at the evidentiary hearing from their testimony at the detention hearing do not cast into doubt the overall credibility of the officers.

basis for suspecting criminal activity was afoot. *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002).

The reasonableness of an investigative stop is evaluated by looking at "whether the officer's actions were justified at the inception of the stop" and "whether the stop was reasonably related in scope to the circumstances that justified the stop in the first place." *Jackson*, 300 F.3d at 745. The totality of circumstances known to the officer at the time of the stop must be considered in making the evaluation. *Id*. This includes the "experience of the law enforcement agent and the behavior and characteristics of the suspect." *Id*.

The facts must be judged against an objective standard: would the facts available to the officer at the moment of the seizure lead a man of reasonable caution to believe that the person about to be stopped has committed or is about to commit a crime. *United States v. Ford*, 333 F.3d 839, 842 (7th Cir. 2003). While reasonable suspicion must be based upon more than an inchoate and uparticularized suspicion or hunch, *Terry v. Ohio*, 392 U.S. 1, 27 (1968), reasonable suspicion does not demand a "fair probability" that the person detained for questioning has committed a crime; reasonable suspicion is considerably lower than proof of wrongdoing by a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Lawful conduct may justify a police officer's reasonable suspicion that criminal activity is afoot, so long as one may rationally infer from the whole picture that the suspect may be involved in criminal activity. *Id*. at 9. Moreover, circumstances which appear innocent to the outside observer may suggest criminal activity to an experienced police officer. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Officers Campos and Noworyta had reasonable suspicion that the Defendant was

engaged in a criminal activity so as to justify detaining him for questioning. As they were approaching an apartment complex parking lot near the 141st Street and Hohman, Campos saw a parked Ford Taurus, facing westbound, and with its lights on. Campos knew that they were in an area known for frequent gang activity. Campos saw a white man walk up to the passenger's side of the Taurus and hand something to the driver. The white man then turned and looked directly at the squad car. He had a panicked expression on his face and hurried into Apartment 8 on the corner. He did not run but walked quickly and shut the door. Campos, who has witnessed hand-to-hand drug sales at least two dozen times, believed that he had just seen a drug deal. These circumstances justified the officers actions in parking their car diagonally in front of the Defendant's car and shining the spotlight on the Defendant.

This momentary seizure was further justified by an increased suspicion that something was not right. When the officers got out of their car, they saw the Defendant look at them in "a frantic state, kind of packing [sic] back and forth at both of [them]. And it looked like he was, like freaking out . . . he started reaching in his pocket, and he pulled out a plastic bag, and he stared to reach down towards his left boot area, like pant leg—lower pant leg . . . he was trying to hide something." (Tr. at 13, 1–10.) Because of the Defendant's actions, Noworyta thought that the Defendant had a gun. (Tr. at 56, 15.) Thus, only seconds had passed since the officers pulled in front of the Defendant's car, before their suspicions of criminal activity were further increased.

Worried that the Defendant had a gun, Noworyta ordered Vinson to get out of the car, but he did not comply. Defendant disregarded several orders from Noworyta to show his hands. By now, Campos had drawn his gun and was also ordering the Defendant to show his hands. Noworyta opened the driver's door and forcibly removed the Defendant. He ordered the

14

Defendant to place his hands on the car, but the Defendant again did not comply until ordered once more. Noworyta patted him down from the feet up because he was concerned that the Defendant was hiding something on the lower parts of his body. As Noworyta pulled up the Defendant's pants, a large plastic bag containing several smaller plastic bags filled with what appeared to be narcotics fell out of the Defendant's boot. At this point, reasonable suspicion turned into probable cause to arrest the Defendant. Again, only couple minutes passed from when the officers arrived, making the entire seizure that much more reasonable. The Defendant does not challenge the officers' conduct from the point of arrest, so the Court need not discuss it.

      The cases cited by the Defendant do not convince the Court to adopt the Defendant's position. The Defendant argues that the officers did not have a particularized suspicion, that is a suspicion that he was involved in a specific criminal activity. He compares his case to the case of the defendant in *Reid v. Georgia*, 448 U.S. 438 (1980), where a DEA agent detained a suspect at the airport merely because the suspect had flown in from a known drug dealing city; he arrived during an off-peak time, when drug dealers often do; he was acting in a suspicious, deceptive manner; and he had no luggage. The Supreme Court held that "the agent could not, as a matter of law, have reasonably suspected [him] of criminal activity on the basis of these observed circumstances." *Id*. at 441. In fact, the Defendant suggests that the agent in *Reid* had more basis to be suspicious than did Campos and Noworyta. The Defendant also compares his circumstances to the benign act of standing alone in a neighborhood frequented by drug dealers, as in *Brown v. Texas*, 443 U.S. 47, 52 (1979), or the conduct of four persons, sitting in a car with out-of-town license plates, avoiding eye contact with police officers, as in *United States v. Pavelski*, 789 F.2d 485, 489 (7th Cir. 1986).

But these cases differ from the one at hand. Campos did have a reasonable, particularized suspicion to briefly detain the Defendant: on the basis of his experience, Campos believed that he had witnessed a drug deal taking place. This suspicion was further increased by the white man's nervous behavior upon seeing the police car and his hurried way of getting back inside. Furthermore, Campos and Noworyta had just gotten out their car when the Defendant became frantic and appeared to be hiding something inside his boot. These circumstances are consistent with the behavior of someone trying to avoid detection because a crime had just been committed or was about to be committed. They are a far cry from landing at an off peak time without luggage or standing alone in a neighborhood frequented by drug dealers, or sitting in a car with out-of-town license plates, refusing to make eye contact with the police.

Accordingly, the Defendant's motion to suppress drug evidence to be used in Count 2 will be denied.

**D.     Conclusion**

For these reasons, the Court denies the Defendant's motions:

- Motion to Suppress Gun Evidence to be Used in Count 1 (DE 22);
- Motion to Dismiss the Indictment (DE 21); and
- Motion to Suppress Drug Evidence to be Used in Count 2 (DE 23).

SO ORDERED on March 13, 2009.

s/ Joseph S. Van Bokkelen  
Joseph S. Van Bokkelen  
United States District Judge